UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SUNBELT RENTALS, INC.,<br>*Plaintiff*,<br><br>v.<br><br>JAMES MCANDREWS,<br>*Defendant*. | Civil No. 3:21cv774 (JBA)<br><br><br>August 5, 2021 |

**RULING DENYING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Sunbelt Rentals, Inc. brings this lawsuit against its former employee James McAndrews for breach of a noncompetition agreement, violation of the federal Defend Trade Secrets Act and the Connecticut Uniform Trade Secrets Act, and unjust enrichment. (Compl. [Doc. # 1].) Sunbelt now moves for a temporary restraining order and preliminary injunction to enjoin Defendant from continuing his employment at Riggs Distler and otherwise violating his employment agreement. (Mem. in Supp. of Mot. for TRO and Prelim. Inj. [Doc. # 8].) The Court held an evidentiary hearing on June 23 and June 25, 2021 to consider both requested forms of relief.

**I.    Background**

Plaintiff describes itself as "a national market leader in the extremely competitive business of renting and selling equipment and tools for use in the manufacturing, industrial, and construction industries." (Compl. ¶ 17.) In July 2018, Plaintiff purchased Mabey, Inc., a company that provided ground protection services for construction sites along the East Coast. (*Id.* ¶ 28.) As a part of the acquisition, Plaintiff hired many Mabey employees, including Defendant, who then served as a "National Account Manager for the North East" for Mabey. (*Id.* ¶¶ 30-31.) Defendant was hired as a Site Access Solutions Strategic Customer Manager in Sunbelt's Ground Protection Division, (*id.* ¶ 32), and he was internally assigned to a regional cost center that serviced Sunbelt's Spartanburg, South Carolina; Vidor, Texas;

1

Bakersfield, California; Jessup, Maryland; Whitewater, Wisconsin; Jacksonville, Florida; and Trainer, Pennsylvania stores. (Compl. ¶ 50.) In this position, Defendant was responsible for, *inter alia*, "preparing and submitting matting/ground protection service proposals (bids) to line contractors, or directly to end clients (typically large utilities), who would either accept or reject Sunbelt's bid." (*Id.* ¶ 34.) Pursuant to these duties, "Defendant received various confidential business materials from Sunbelt" and was "instrumental in developing and influencing strategy taken to pursue and win business." (*Id.* ¶ 38.) As a condition of employment, Defendant was required to sign an agreement with "noncompetition, nonsolicitation, and confidentiality covenants." (*Id.* ¶ 39.)

In Section 5.2.4 of the Employment Agreement, Defendant promised, for one year after the date of expiration or termination of the Agreement, not to directly or indirectly

> compete with the Corporation, its successors and assigns by engaging, directly or indirectly, in the Business as conducted at the Designated Stores or in a business substantially similar to the Business as conducted at the Designated Stores within the 'Territory.'

(Employment Agreement, Ex. 1 to Compl. [Doc. # 1-1] at 5.) The Business is defined as

> (i) selling and renting equipment, tools, climate control units, scaffolding, oil & gas equipment (including, but not limited to, man lifts, generators, light towers, trash trailers, shocks subs, test separators, shower trailers, trash pumps, 3 inch water pumps, 6 inch water pumps, water transfer services, fuel trailers, air compressors, water stations, RV pack (light tower/water station combination,) trailer houses, sewer systems, etc.) and parts for use in the manufacturing, industrial and construction industries , [and]. . . (iv) the provision of related services, including, but not limited to, the erecting and dismantling of scaffolding, providing crane trucks, delivery of OCTG goods, delivery of frac valves, burner installation and repair, test separator repair, catering services and portable restroom services.

(*Id.* at 3.) And the Territory is defined as

> the geographical area within a fifty (50) mile radius of any of the Corporation's stores in which, or in connection with, Employee performed or was responsible for performing services at any time during the twelve (12) month period immediately preceding the termination or expiration of this Agreement for any reason (the '<u>Designated Stores</u>').

(*Id.* at 5.)

>Section 9 contains a severability clause which provides that

>>The provisions of this Agreement, particularly Paragraphs 5 and 6 [which set out the restrictive covenants and intellectual property rights], are hereby deemed by the parties to be severable, and the invalidity or unenforceability of any one or more of the provisions of this Agreement shall not affect the validity or enforceability of the other provisions hereof.

(*Id.* at 7.)

Defendant signed this Agreement on October 21, 2018. (*Id.* at 8.)

On April 26, 2021, Defendant resigned from Sunbelt and stated his intent to begin work for Riggs Distler as the General Manager of Environmental Construction and Matting. (Compl. ¶ 103.) Plaintiff contends that Riggs Distler is a competitor as described in section 5 of the employment agreement with Defendant, and his employment with Riggs thus violates the noncompetition covenant. (*See id.* ¶ 106.) Despite Plaintiff reminding Defendant of the noncompetition agreement, Defendant gave no "indication that [he] will cease and desist from working for Riggs in a competitive capacity." (*Id.* ¶ 119.)

Shortly before Defendant resigned from Sunbelt, he forwarded from his work email to his personal email numerous documents that contained Plaintiff's confidential information. (*See id.* ¶¶ 75-91.) In addition, Defendant had "connected several flash/USB drives to his Sunbelt laptop on multiple occasions between January 2021 and his resignation on April 26, 2021. (*Id.* ¶ 94.) Defendant copied numerous files containing Plaintiff's confidential information on that zip drive regarding various matting projects. (*Id.* ¶¶ 92-107.) Plaintiff claims Defendant had no legitimate reason or authority to use a zip drive as a part of his job and did not turn in any zip drives or portable storage devices at the time of his resignation. (*Id.* ¶ 100.) Based on these circumstances, Plaintiff believes that Defendant is using the zip drives to "misappropriate Sunbelt's confidential information" for the benefit of Riggs Distler, his new employer, (*id.* ¶¶ 101-102), while Defendant insists that he copied the documents onto zip drives only so he could print them at the local Staples as he worked from

home and did not have a high-quality printer there, (McAndrews Affidavit, Ex. A to Def.'s Mem. in Opp. [Doc. # 21-1] ¶ 55.)

## II. Legal Standard

### a. Temporary Restraining Order

"The purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Pan Am. World Airways, Inc. v. Flight Engineers' Intern. Ass'n, PAA Chapter, AFL-CIO*, 306 F.2d 840, 842 (2d Cir. 1962.) "Such an order is necessarily limited to a very brief period because what may later prove to be a right of the party who is restrained is suspended before even a tentative adjudication as to that right has been had." *Id.* at 843. "The Court must examine whether the movants have demonstrated a threat of irreparable harm that will occur *immediately* to justify a temporary restraining order, while the temporal context of a preliminary injunction takes a longer view." *Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 367-368 (E.D.N.Y. 2020).

### b. Preliminary Injunction

Aside from the temporal distinction, the standards for obtaining a preliminary injunction and a temporary restraining order are the same. *See id.* at 367. To obtain such relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Court's broad discretion is required in determining whether to order relief because such relief "is an extraordinary and drastic remedy." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007).

### III. Discussion

#### a. Likelihood of Success on the Merits

##### i. Breach of Contract

To prevail on a claim for breach of contract, a plaintiff must establish "the formation of an agreement, performance by one party, breach of the agreement by the other party[,] and damages." *Bouchard v. Sundberg*, 80 Conn. App. 180, 189 (2003). Defendant McAndrews maintains that Plaintiff's noncompetition agreement is invalid and unenforceable under Connecticut law because it unreasonably bars him from engaging in a wide range of work not reasonably related to Plaintiff's legitimate interests. (Def.'s Mem. at 13.)

> In order to be valid and binding, a covenant which restricts the activities of an employee following the termination of his employment must be partial and restricted in its operation in respect either to time or place, and must be reasonable – that is, it should afford only a fair protection to the interest of the party in whose favor it is made and must not be so large in its operation as to interfere with the interests of the public. The interests of the employee himself must also be protected, and a restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family.

*Scott v. General Iron & Welding Co., Inc.*, 171 Conn. 132, 137 (1976).

Connecticut courts have interpreted Scott to require courts to consider five criteria for determining the reasonableness of a restrictive covenant: "(1) the length of time the restriction is to be in effect; (2) the geographic area covered by the restriction; (3) the degree of protection afforded to the party in whose favor the covenant is made; (4) the restrictions on the employee's ability to pursue his occupation; and (5) the extent of interference with the public's interests." *New Haven Tobacco Co., Inc. v. Perrelli*, 18 Conn. App. 531, 533-534 (1989). "The five prong test of *Scott* is disjunctive[, and] . . . a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable." *Id.* at 534.

Plaintiff urges the Court to interpret the reasonableness of the restrictive covenants only on the basis of how Sunbelt seeks to enforce them in this action and not as to their "theoretical breadth." (Reply at 4.) But "the interpretation of a contract must be made in

5

accordance with the terms employed in the instrument and a court cannot by that means disregard the words used by the parties or revise, add to, or create a new agreement." *Collins v. Sears, Roebuck & Co.*, 164 Conn. 369, 374 (1973). "The construction and legal effect of a contract 'cannot be changed or varied by reason of its inconvenience to the parties or the unreasonableness of its terms." *Whitaker v. Cannon Mills Co.*, 132 Conn. 434, 440 (1945). There is a narrow exception to this rule whereby courts may strike an unreasonable restrictive covenant where the parties intended for the contract to be severable and the covenants "may be read as containing distinct undertakings bounded by different limits of space or time." *Deming v. Nationwide Mut. Ins. Co.*, 279 Conn. 745, 769, n.21 (2006) (quoting *Beit v. Beit*, 135 Conn. 195, 204-205 (1948)). This is often referred to as the blue pencil rule. *See id.* Some Connecticut trial courts have interpreted the blue pencil rule to allow them to rewrite overly broad and unreasonable restrictive covenants to be narrower in scope upon a showing that the agreement contained a severability clause that expressly permits modification of the contract by a court in such circumstances. *See, e.g., Group Concepts, Inc. v. Barberino*, No. CV030286221, 2004 WL 1050098, at *5 (Conn. Super. Ct. Apr. 16, 2004) (holding that the parties' severability provision demonstrated an intent "to submit to the reduction of territorial or time limitations as the court deems reasonable" and reducing the restriction accordingly). *But see Timenterial, Inc. v. Dagata*, 29 Conn. Supp. 180, 184 (Conn. Super. Ct. 1971) (citing *Beit,* 135 Conn. at 196) (explaining that the blue pencil rule "applies only to cases where the contract in terms specifies several distinct areas, so that erasing the description of one or more of those areas leaves the description of an area for which the restriction is reasonable").

The general rule prohibiting the *post hoc* rewriting of an agreement so as to be enforceable, absent clear language permitting reformation, prevents "employers [from] cast[ing] their nets as widely as possible, secure in the knowledge that while some employees might effectively be deterred from competing by such an agreement, the burden

6

would be on those who chose to compete to convince the court to reform the contractual agreement." *Braman Chem. Enters., Inc. v. Barnes*, No. CV064020633S, 2006 WL 3859222, at *9 (Conn. Super. Ct. Dec. 12, 2006). This limitation on restrictive covenant reformation also serves the important function of giving the employee precise notice of his or her future employment limitations and options.

Plaintiff in effect seeks to invoke the blue pencil rule in advancing its position that the reasonableness of its restrictive covenants should be determined only in light of how Plaintiff seeks to enforce the agreement under the circumstances presented. (*See* Reply at 4 (citing *Grayling Assocs., Inc. v. Albert Villota*, No. CV040833521, 2004 WL 1784388, at *2 (Conn. Super. July 12, 2004)).) However, because the severability provision contained in the Parties' Agreement does not evince an intent to allow the Court to *modify* its restrictive covenants, its argument lacks merit. *See, e.g., Gartner Group Inc. v. Mewes*, No. CV91 0118332 S, 1992 WL 4766, at *5 (Conn. Super. Ct. Jan. 3, 1992) (explaining that the severability clause provided that upon a court's finding that any restriction was unenforceable because the duration or area of the restriction was overbroad, "such court shall reduce the duration, area, or matter of such provision, in its reduced form"); *Grayling*, 2004 WL 1784388, at *1, n.3 (explaining that the agreement "specifically permits the court to modify any position of the restrictive covenant to make it reasonable as opposed to invalid or unreasonable"); *Fairfield Cty. Bariatrics and Surgical Assocs., P.C. v. Ehrlich*, No. FBTCV1050291046, 2010 WL 1375397, at *24, n.7 (Conn. Super. Ct. Mar. 8, 2010) (explaining that the agreement provided that upon a showing that a restrictive covenant was "unreasonable as to either geographic scope or duration, then the covenant shall be modified as to its scope, duration, or both scope and duration, or in any other respects, to the extent necessary to render such restrictive covenant reasonable"). Although the Employment Agreement here contains a severability provision, it only states that "the provisions of this Agreement . . . are hereby deemed by the parties to be severable, and the invalidity or unenforceability of any one or more of the provisions of

this Agreement shall not affect the validity or enforceability of the other provisions hereof." (Employment Agreement at 7.) So while the contract language contemplates striking an unenforceable provision of the agreement while enforcing the remainder, it does not authorize reforming the parties' agreement to reflect the more limited scope Plaintiff advances. Thus, the Court will interpret the contract solely in accordance with its written terms. *See Collins*, 164. Conn. at 374.

### A. Temporal and Geographic Restrictions

"Ordinarily, under Connecticut law, 'time and geographical restrictions [in employment agreements] are to be reviewed as intertwined considerations,' meaning, for instance, that 'a restriction covering a large area might be reasonable if in effect for a brief time, while a restriction covering a small area might be reasonable for a longer time.'" *A.H. Harris & Sons, Inc. v. Naso*, 94 F. Supp. 3d 280, 293 (D. Conn. 2015) (quoting *Van Dyck Printing Co. v. DiNicola*, 43 Conn. Supp. 191 (1993)). Where an employer's market involves developing long-term relationships with clients and customers on projects that extend for years, a longer temporal restriction is likely reasonable. *See A.H. Harris*, 94 F. Supp. 3d at 294. Geographic restrictions are more likely reasonable where they prohibit a former employee from working for a competitor in an area where the former employer does business or is likely to do business. *See Scott v. Gen. Iron & Welding Co.*, 171 Conn. 132, 138 (1976) ("A restrictive covenant which protects the employer in areas in which he does not do business or is unlikely to do business is unreasonable with respect to area.") For instance, an agreement preventing an employee from working for a competitor within a 50-mile radius of Hartford City Hall was unreasonable because the area covered 7,850 square miles while the plaintiff's customers were located in only 700 square miles, and there was no reason to believe that the employee had a particular advantage over her former employer in soliciting the roughly two million potential customers spread out over the remaining 7,150 miles. *Braman*, 2006 WL 3859222, at *6.

Here, the Agreement forbids Defendant from working for any company that competes even indirectly with any of Sunbelt's businesses in the Territory, which is defined as the fifty-mile radius around any of Sunbelt's stores where Defendant performed services during the twelve months prior to his termination. Although Plaintiff alleges that Sunbelt assigned Defendant to service seven different stores, it claimed both in its briefing and at the evidentiary hearing that because "most of Defendant's work . . . was serviced out of [the Trainer and Jessup locations]," the Agreement only precluded him from working within fifty miles of those stores. (Pl.'s Mem at 8; Reply at 2.) But the Agreement defines Territory as the area within fifty miles "of *any* of the Corporation's stores in which, or in connection with which, Employee performed or was responsible for performing services" during the twelve months prior to his termination. (Agreement at 5 (emphasis added).) It does not state that the Territory is limited only to where an employee primarily performed services. Since the Court will not reform the parties' Agreement, the Court does not evaluate the geographic scope within the limits Plaintiff propounds.

Even accepting, as Plaintiff urges, that Defendant was only responsible for performing matting sales services in the twelve months prior to termination at the Jessup, Maryland and Trainer, Pennsylvania locations, (*see* Reply at 2), the Agreement's fifty-mile radius term still effectively forbids Defendant from working for any company that does any business that directly or indirectly competes with Sunbelt in the metropolitan areas of Washington, D.C., Baltimore, Wilmington, Philadelphia, and Trenton, even if Defendant is not personally engaged in any such business. Interestingly, neither matting nor ground protection is even listed as the businesses in which Plaintiff is engaged. If Defendant were to get a job working in construction site matting with projects exclusively in Connecticut, which is entirely outside either fifty-mile radius measurement, but the company for which he worked also performed construction services such as renting portable toilets or offering catering services to construction sites in Philadelphia, his employment with the company would appear to

9

breach his contractual obligation not to "engag[e], directly or indirectly, in the Business . . . or a business substantially similar to the Business . . . within the 'Territory.'" (Agreement at 3, 5.) And an employee such as Defendant would similarly be forbidden from working for Riggs Distler even in a position completely unrelated to construction, such as performing custodial work or serving as a computer programmer. So while the fifty-mile geographic limitation may appear reasonably narrow, the restriction applies to a wide swath of companies around the country by virtue of Sunbelt's extremely broad definition of its "Business" and would result in precluding Defendant from working in the construction site matting industry even in geographic areas in which Plaintiff is not engaged in matting whatsoever. *See Scott*, 171 Conn. at 138. This overbreadth is precisely the type of mischief to be avoided by requiring reasonableness in employment restrictive covenants.

### B. Degree of Protection to the Employer

> [R]estrictions are valid when they appear to be reasonably necessary for the fair protection of the employer or business or rights. Especially if the employment involves the employee's contacts and associations with clients or customers it is appropriate to restrain the use, when the service is ended, of the knowledge and acquaintance, so acquired, to injure or appropriate the business which the party was employed to maintain and enlarge.

*Robert S. Weiss and Assocs., Inc. v. Wiederlight*, 208 Conn. 525, 533 (1988) (internal quotations and alterations omitted). In *Wiederlight*, the Connecticut Supreme Court explained that "[t]he trial court's conclusion that the covenant was reasonable was consistent with evidence that the plaintiff sought to protect information regarding current and potential customers in the Stamford area." *Id.* To the contrary, a restriction "relating to every city in which the plaintiff has established a branch store[] is not reasonably necessary for the fair protection of the plaintiff's business." *Samuel Stores, Inc. v. Abrams*, 94 Conn. 248, 248 (1919).

Here, this restrictive covenant resembles that in *Samuel Stores*. Although at first blush the covenant may appear to be tied directly to Defendant's places of employment, Plaintiff's

broad definition of "business" has not been in any way tailored to Defendant's actual scope of work during his employment with Sunbelt,[1] indicating that Plaintiff is seeking to restrict Defendant far beyond what is needed to protect its legitimate business interests. That, for example, Defendant could not do matting work for a company that performed matting services exclusively in Connecticut but offered water transfer services in Baltimore contradicts Plaintiff's contention that the restrictions are "reasonable and necessary to prevent Defendant from misusing Sunbelt's confidential customer information and from misappropriating Sunbelt's goodwill." (Pl.'s Mem. at 20-21.)

### C. Restriction of the Employee's Ability to Pursue His Occupation

"A restrictive covenant is unenforceable if by its terms the employee is precluded from pursuing his occupation and thus prevented from supporting himself and his family." *Scott*, 171 Conn. at 137. "Under this consideration, 'the test for reasonableness is not whether the defendant would be able to make a living in other ways, or in other occupations, but whether or not the Agreement as drafted and applied would unfairly restrain her opportunity to pursue her occupation.'" *A.H. Harris*, 94 F. Supp. 3d at 298 (quoting *Creative Dimensions, Inc. v. Laberge*, No. CV116020991, 2012 WL 2548717, at *5 (Conn. Super. May 31, 2012) (alterations omitted)). In *Creative Dimensions*, the Connecticut Superior Court found that a noncompete agreement was overly broad and restricted the employee's ability to pursue his profession because "[w]ith its prohibition against working in any area in which they worked at CDI, and with its prohibition against working with any current or prospective customer of CDI, the Agreement would, essentially, keep the defendants out of the portable display industry for eighteen months, for no other reason than to prevent the defendants

---

[1] While the Agreement does limit the noncompetition restriction to conduct that engages directly or indirectly with "the Business *as conducted at the Designated Stores* or in a business substantially similar to the Business as conducted at the Designated Stores," Plaintiff offered no evidence indicating that the scope of business conducted at Defendant's assigned stores is in any way narrower than the Agreement's broad definition of business. (Agreement at 5 (emphasis added).)

11

from competing with CDI." *Creative Dimensions*, 2012 WL 2548717, at *5. Since the portable display market does not involve "a fixed clientele," "sales staff are fairly transient," and "the market is highly competitive," "[a] blanket prohibition on working with or soliciting current or prospective CDI customers or current employees would be impractical and impossible without barring the defendants from the market entirely for eighteen months." *Id.*

At this early stage in the litigation, it appears that Defendant would likely be unduly restricted from pursuing his career in the matting industry since he is precluded from working for any company which directly or indirectly engages in Sunbelt's broadly defined "business" within 50 miles of Jessup or Trainer, even if Defendant himself is engaged in no such activity within that geographical limitation. Although Jeffrey Niesz, the general manager for the ground protection division at Sunbelt, opined that there were a number of different matting companies Defendant could have worked for without violating the noncompetition agreement, such as Ironwood, BLUROC, and Supreme Industries, he offered no evidence that these companies in fact do not engage in any "business" within the Territory. Moreover, these statements appeared to rely on the Court reforming the Agreement in narrower terms so as to narrow the geographic restrictions to the areas outside of Trainer and Jessup, which, as discussed *supra*, cannot be done with this contract.

### D. Public Interest

Connecticut courts examine three factors in evaluating the reasonableness of a covenant that is alleged to violate the public interest: "(1) the scope and severity of the covenant's effect on the public interest; (2) the probability of the restriction creating or maintaining an unfair monopoly in the area of trade; and (3) the interest sought to be protected by the employer." *New Haven Tobacco*, 528 A.2d at 640.

Defendant concedes that he "has no hard evidence that enforcing these covenants will harm the public interest." (Def.'s Mem. at 26.) Since there are numerous competitors of Sunbelt, it appears unlikely that restricting Defendant's employment would create or

maintain Plaintiff's monopoly in the industry. And Plaintiff does have a legitimate interest in protecting its customers and goodwill. *See New Haven Tobacco*, 11 Conn. App. at 642. Although Plaintiff seeks to restrict Defendant's employment in an overly broad way, it does not appear that this overly broad restriction would result, for example, in the public's reduced ability to access matting and ground protection services.

### E. Conclusion

Because the five-prong test for evaluating the reasonableness of a restrictive covenant is disjunctive, the Court's conclusion that Plaintiff's definition of business and geographic limitations are overly broad and effectively prevent Defendant from reasonably pursuing his occupation means that Section 5.2.4 of the Agreement, which sets forth the noncompetition provision, is not enforceable as a matter of law. Without a valid and enforceable contract, Plaintiff is unlikely to succeed on the merits of its breach of contract claim. Without a likelihood of success on the merits, the Court must deny Plaintiff's request to enjoin Defendant's continued employment at Riggs Distler on the basis of the noncompetition agreement between the Parties.

#### i. Trade Secrets

Under the Defend Trade Secrets Act (DTSA),[2] a "defendant misappropriates a trade secret (1) when it acquires a trade secret by improper means, or (2) discloses or uses the trade secret without consent." *Medidata Sols., Inc. v. Veeva Sys., Inc.*, 17 Civ. 589 (LGS), 2018 WL 6173349, at *4 (S.D.N.Y. Nov. 26, 2018). Plaintiff admittedly has no evidence that Defendant has actually misappropriated any trade secrets or other confidential and

---

[2] Plaintiff also brings claims under the Connecticut Uniform Trade Secrets Act (CUTSA). The elements necessary to prove a violation of each of these statutes are largely the same, with both laws requiring plaintiffs to demonstrate the existence of a trade secret that the defendant misappropriated. *Compare* 18 U.S.C. § 1836(b)(1), *with* Conn. Gen. Stat. § 35-51. However, the federal law also requires a showing that "the trade secret is related to a product or service used in, or intended for use in, interstate and foreign commerce." 18 U.S.C. § 1836(b)(1). Since the relationship to interstate commerce is not at issue here, the Court analyzes the claims under both statutes together.

proprietary information. Rather, Plaintiff reasons that disclosure of trade secrets is inevitable because of Defendant's new position with Riggs Distler, which Plaintiff maintains is a direct competitor of Sunbelt. (*See* Pl.'s Mem. at 27; Reply at 6.)

The "inevitable disclosure" doctrine stands for the proposition that in some circumstances, a court will find that a defendant cannot help but reveal trade secrets. *See Aetna, Inc. v. Fluegel*, No. CV 074033345S, 2008 WL 544504, at *5 (Conn. Super. Feb. 7, 2008). The following factors are considered in determining whether to grant the injunctive relief sought by a prior employer on the basis of inevitable disclosure: "(1) [whether] the employers in question are direct competitors providing the same or very similar services; (2) [whether] the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; and (3) [whether] the trade secrets at issue are highly valuable to both employers." *EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 310 (S.D.N.Y. 1999). "[T]he inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory." *Id.*

Since there is no judicial consensus on whether the DTSA permits application of the inevitable disclosure doctrine, many federal courts look to state law for guidance. *See, e.g.*, *Packaging Corp. of America, Inc. v. Croner*, 419 F. Supp. 3d 1059, 1069 (N.D. Ill. 2020) (looking to Illinois trade secret caselaw recognizing the inevitable disclosure doctrine in analyzing a DTSA claim); *Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 521 (E.D. Pa. 2018) (looking to Pennsylvania trade secret caselaw recognizing the inevitable disclosure doctrine in evaluating a DTSA claim). The Second Circuit has never considered the question, and Connecticut courts have rarely invoked it, *Aetna*, 2008 WL 544504, at *6 ("Connecticut courts have seldom considered the doctrine of inevitable disclosure.").

A widely cited case articulating the doctrine is *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995), where the plaintiff brought a claim under the Illinois Trade Secrets Act.

There, the defendant employee left his job as General Manager of the California business unit of PepsiCo to work as Vice President of Field Operations for Quaker's Gatorade division. *Id.* at 1264. PepsiCo offered evidence at a preliminary injunction hearing that the employee had access to numerous trade secrets, including the Annual Operating Plan which contained the "pricing architecture" for the company's sports drinks and referenced trade channels, package sizes, and other characteristics of its sports drinks. *Id.* at 1265. This document was designated as "highly confidential." *Id.* PepsiCo also offered evidence that, in his new position, the employee would engage in strategic planning for Gatorade (a sports drink product) and management of the sales efforts of Gatorade. *Id.* at 1266. This evidence led the district court to conclude that the employee "would have a high position in the Gatorade hierarchy," where PepsiCo's trade secrets and confidential information "would necessarily influence his decisions." *Id.* at 1266-1267. Significantly, given the defendant employee's lack of forthrightness both in his conduct prior to obtaining new employment and in his testimony, the district court concluded that disclosure under the circumstances was probable. *Id.* at 1270-1271. The Seventh Circuit affirmed, explaining that PepsiCo demonstrated that the defendant had knowledge of particularized plans and processes that were unknown to others in the industry and which gave the new employer an advantage over competitors. *Id.* at 1269. It stressed, however, that "general skills and knowledge acquired during his tenure" at PepsiCo would be insufficient to conclude that misappropriation of trade secrets was inevitable. *Id.* at 1269.

The circumstances here are quite different from those in *PepsiCo*. Although Riggs Distler and Sunbelt are competitors in the sense that both perform matting and ground protection services, the two companies perform these services in different contexts, and Defendant's positions at the two companies are significantly different. According to Plaintiff's witness Mr. Niesz, Sunbelt owns approximately 60,000 composite mats and 150 timber mats whereas Riggs Distler owns 40,000 timber mats and 7,500 composite mats.

15

Although the Parties vigorously dispute whether timber and composite mats are interchangeable for customer needs, Mr. Niesz acknowledged that there are some projects that preclude use of timber matting. Moreover, Sunbelt bids primarily to line contractors whereas Riggs primarily bids directly to utility companies, meaning that while Sunbelt bids to contractors who bid to utility companies, the matting services at Riggs are just one part of the larger package it offers presently to utility companies. So while the two companies do share similarities in that they both provide matting services, including some of the same matting work, their roles in the industry appear fairly distinguishable. The hearing evidence did not establish that this difference was insignificant.

Perhaps more importantly, Defendant's roles in the two companies are quite different. Both parties agree that Defendant was a sales professional at Sunbelt who earned a sales commission, and it is undisputed that at Riggs, where he is General Manager of Environmental Construction, Defendant does not engage in sales and does not earn a commission. Rather, Defendant testified that unlike at Sunbelt where he prepared competitive bids, at Riggs, his involvement in bidding is supplying the actual costs of particular projects to the transmission overheard division, which then decides entirely separately how to price the overall bid that includes services beyond matting. In addition, both of Plaintiff's witnesses emphasized the integrity of Defendant stating that he is "credible," "one of our best" businessmen, and "a good person," in contrast to the defendant in *PepsiCo* whose honesty was repeatedly called into question. *See PepsiCo*, 54 F.3d at 1270. Finally, since Defendant does not engage in sales at Riggs Distler and Riggs Distler bids to a different client base, Plaintiff failed to demonstrate how purportedly confidential and proprietary information like the customer lists and business development strategies with those customers would prove of particular value in Defendant's new position at Riggs. Rather, Plaintiff's witnesses repeatedly emphasized that Sunbelt was now at a disadvantage because Defendant was a matting expert who had developed his expertise throughout his

tenure at Mabey and Sunbelt, thus indicating that Plaintiff's concerns include unprotected information rather than "particularized plans and processes . . . which are unknown to others in the industry." *PepsiCo*, 54 F.3d at 1269.

Given the disfavored nature of the inevitable disclosure doctrine, the absence of a high degree of similarity between Defendant's old and current positions, and the somewhat dissimilar relationships with customers of Sunbelt and Riggs Distler in providing matting services, the Court concludes that even if the inevitable disclosure doctrine were to apply to Plaintiff's trade secrets claims, Plaintiff has not shown that it would be likely to succeed on the merits on those claims, and an injunction on those grounds must therefore be denied.

## IV.   Conclusion

For the reasons set forth in the above ruling, Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction [Doc. # 8] is DENIED.

IT IS SO ORDERED.



/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 5th day of August 2021.